# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Sierra Petroleum Co., Inc,

       Plaintiff,

   v.

Beaudry Oil & Service, Inc.; Beaudry
Convenience, Inc.; Kenneth J. Beaudry;
Joshua Lund; and Lisa Lund,

       Defendants.

Beaudry Convenience, Inc.; Joshua Lund;
and Lisa Lund,

       Counter-Plaintiffs,

   v.

Sierra Petroleum Co., Inc.,

       Counter-Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 08-6466 ADM/SER

---

Kelly S. Hadac, Esq. and John E. Brandt, Esq., Murnane Brandt, P.A., St. Paul, MN, on behalf of
Plaintiff/Counter-Defendant.

Patrick W. Michenfelder, Esq., Gries & Lenhardt, P.L.L.P., St. Michael, MN, on behalf of
Defendants/Counter-Plaintiffs.

---

# I. INTRODUCTION

On March 15, 2011, the undersigned United States District Court Judge heard oral

argument on Defendants Beaudry Oil & Service, Inc. ("BOSI"), Beaudry Convenience, Inc.

("Beaudry Express"), Kenneth J. Beaudry, Joshua Lund, and Lisa Lund's (collectively,

"Defendants") Motion for Summary Judgment [Docket No. 153]; Plaintiff Sierra Petroleum Co.,

Inc.'s ("Sierra") Motion for Partial Summary Judgment [Docket No. 146]; and Sierra's Motion

for Summary Judgment Dismissing Defendants' Counterclaims [Docket No. 141].  For the

reasons set forth below, the Court grants in part and denies in part the Defendants' Motion;

grants in part and denies in part Sierra's Motion for partial summary judgment; and grants

Sierra's Motion for summary judgment dismissing Defendants' counterclaims.

## II.  BACKGROUND[1]

This case arises from the sale of BOSI's wholesale gasoline supply business to Sierra in

August 2005.  The sale resulted in BOSI transferring to Sierra its right to supply gasoline to

approximately fifty retail gasoline station/convenience stores ("C-stores" or "customer

locations").  2d Am. Compl. [Docket No. 85] Exs. A (Acquisition Agreement), B (Bill of Sale

and Assignment).  Over thirty of the locations were "branded" locations, meaning they sold

trademark-branded fuel such as Shell or ConocoPhillips.

**A.     Acquisition Agreement**

The terms of the sale, set forth in the Acquisition Agreement ("AA"), required Sierra to

pay $2.4 million, assume BOSI's contingent liabilities to major oil companies of approximately

$1,325,720, and reimburse BOSI approximately $800,000 in loans BOSI had made to some of its

customer locations.  Acquisition Agreement ¶¶ 2.3-2.5.  In the AA, BOSI represented that it

anticipated sufficient revenues would be available to offset the liabilities being assumed by

Sierra.  Id. ¶¶ 2.4, 2.5.  BOSI also represented that it operated its wholesale gasoline supply

business in substantial compliance with applicable laws and requirements, and that the

---

[1] On a motion for summary judgment, the Court views the evidence in the light most
favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  As
both parties have moved for summary judgment, any disputed facts are noted.

information provided in the AA was accurate, complete, and not misleading.  Id. ¶¶ 6.3, 6.5.  The AA further provided that Sierra would conduct due diligence in deciding to purchase the assets described in the AA.  Id. ¶ 7.2.

**B.**    **Additional Agreements**

A number of additional agreements were executed or assigned in conjunction with the AA, including: (1) a Fuel Hauling Agreement ("FHA") providing that BOSI would serve as the exclusive fuel hauler for Sierra, Hadac Aff., Feb. 1, 2011 ("1st Hadac Aff.") [Docket No. 149] Ex. 13; (2) a Five-Site Master Agreement ("Marathon Agreement") with Marathon Oil Company ("Marathon") obligating Sierra to purchase a minimum number of gallons of Marathon branded fuel and deliver the fuel to five specific Marathon branded locations, id. Ex. 14; (3) a Seller's Covenant Not to Compete ("Non-Compete Agreement") prohibiting BOSI from owning, operating, or participating in an entity that directly competes with Sierra's wholesale gasoline supply business, id. Ex. 15; (4) an Agreement ("Exclusive Supply Agreement") with C-store Beaudry Express and its owners, defendants Joshua and Lisa Lund (collectively, "the Lunds") under which Beaudry Express and the Lunds agreed to purchase and accept only Shell branded gasoline from Sierra, id. Ex 16; and (5) a Post Closing Accounting Agreement making Sierra responsible for an estimated $5,000 in work to be completed at a C-store located in Delano, Minnesota.  Id. Ex. 19 ¶ 9.

**C.**    **Customer Failings**

Within weeks after the closing, Sierra's president George Athans ("Athans") avers several of the acquired customer locations expressed "financial and business issues relative to profitability."  Athans Aff., Feb. 22, 2011 ("1st Athans Aff.") [Docket No. 159] ¶ 4.  One

customer location failed within thirty days after the acquisition closed.  Id.  In the year that followed, over 200 checks or drafts by Sierra's customer locations were returned for non-sufficient funds.  Id. Ex. 1.  As of March 2011, 35 of the 51 customer locations acquired by Sierra had either failed, terminated their supply agreements, or were terminated by Sierra due to failure to pay under the terms of the supply agreement.[2]  Athans Aff., March 1, 2011 ("2d Athans Aff.") [Docket No. 166] ¶ 6.

## D.    Marathon Volume Issues

Sierra alleges that soon after the closing it became obvious that the Marathon volume requirements were not being met by supplying the five Marathon locations.  1st Hadac Aff. Ex. 12 ("Athans Dep.") at 222.  At the sale closing, Leon Beaudry, BOSI's operations manager, informed Athans that Marathon authorized BOSI to place Marathon fuel in BOSI's bulk tank.  1st Hadac Aff. Ex. 6 ("Leon Beaudry Dep.") at 68-69.  Leon Beaudry asked Athans if Sierra had a bulk tank, and told him Sierra "might have a hard time" meeting the gallon volume requirement under the Marathon Agreement.  Id.  Ultimately, Sierra was unable to meet the volume requirements under the Marathon Agreement and was required to pay Marathon $41,422.27 for the volume shortfall.  Athans Aff., Feb. 1, 2011 ("3d Athans Aff.") [Docket No. 150] at ¶ 4, Ex. 3.

## E.    Misbranded Deliveries

In approximately July 2008, Athans discovered the Lunds and Beaudry Convenience had received and were selling unbranded or non-Shell fuel products at the Shell branded locations.

---

[2] Five customer locations closed or had contracts terminated in 2005, four in 2006, seventeen in 2007, four in 2008, three in 2009, and two in 2010.  Expert Report of H. Edward Morris Jr. ("Morris Report") [Docket No. 132] at 11.

Athans Aff., April 13, 2009 ("4th Athans Aff.") [Docket No. 19] ¶ 3.  Athans contacted BOSI's

CEO, Kenneth Beaudry, who is also Lisa Lund's father, and told him BOSI could not deliver

unbranded or non-Shell petroleum products to Beaudry Express.  Id.; 1st Hadac Aff. Ex. 8

("Kenneth Beaudry Dep.") at 105.  Despite this conversation, in early October 2008 Kenneth

Beaudry again instructed BOSI's fuel dispatcher to deliver non-Shell fuel to Beaudry Express.

Kenneth Beaudry Dep. at 105-106; 4th Athans Aff. ¶ 4.

**F.     Lawsuit and Discovery**

Sierra commenced this action in December 2008, alleging trademark infringement, unfair

competition, deceptive trade practices, breach of contract, fraud, unjust enrichment, conspiracy,

and tortious interference with contractual relations.[3]  Compl. [Docket No. 1].  Sierra was granted

a preliminary injunction in April 2009 enjoining BOSI and Kenneth Beaudry from delivering

non-Shell fuel products to Beaudry Convenience.  Order, Apr. 14, 2009 [Docket No. 21].

Following a contentious discovery process, Sierra now possesses bills of lading

documenting fuel deliveries made by BOSI to customer locations prior to the acquisition.[4]  The

bills of lading reflect deliveries by BOSI of over eight million gallons of misbranded fuel to

branded C-store locations from 2003 to the closing of the sale in November 2005.  1st Hadac

Aff. Ex. 17.  The misbranded fuel deliveries for those years range from nine to eighteen percent

of BOSI's total fuel deliveries.  Id.

---

[3] Sierra is voluntarily dismissing its state law deceptive trade practices and unfair
practices claims.  Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. [Docket No. 158] at
48.

[4] Each of BOSI's fuel deliveries were generally accompanied by a bill of lading which
provided shipping information including the date of the fuel delivery, the customer location
receiving the delivery, and the type and amount of fuel delivered.

Based on the new documentation, Sierra amended its Complaint to assert allegations that BOSI's financial condition was misrepresented as a result of BOSI's purchase and delivery of lower-priced, unbranded fuel to branded customer locations who in turn sold the fuel under branded trademarks. Sierra contends this practice: (1) allowed BOSI and its customer locations to achieve falsely inflated profit margins, and (2) overstated the volume of branded fuel BOSI historically sold to its customers. 2d Am. Compl. ¶¶ 131-133. Sierra alleges that after it acquired BOSI's fuel supply business it was unable to achieve the profit margins claimed by BOSI, and that many of its customers went out of business. Id. ¶¶ 140-143. Sierra alleges it would not have purchased BOSI's wholesale gasoline supply business or would have paid a substantially lower price had it known of the misbranding.

BOSI denies the allegations in the Second Amended Complaint and moves for summary judgment on all counts. BOSI argues the delivery of unbranded fuel during fuel shortages or outages is necessary and customary in the fuel hauling industry, and that Sierra, as a knowledgeable and longtime participant in the fuel industry, was aware of this industry practice when it entered into the AA. BOSI further contends Sierra's invoicing and receiving payment for misbranded fuel deliveries that occurred after the acquisition preclude Sierra from now seeking to recover against BOSI for such conduct. BOSI urges that the failure of several C-stores following the acquisition was due to the economy and factors unrelated to BOSI. Defendants filed counterclaims against Sierra for breach of the FHA, conspiracy to breach the FHA, and tortious interference with prospective contractual relations.

## III.  DISCUSSION

**A.      Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Sierra's Breach of Contract Claims**

Sierra seeks summary judgment on its claims for breach of the AA, the Exclusive Supply Agreement, the FHA, and the Non-Compete Agreement.  Conversely, Defendants seek summary judgment dismissing Sierra's breach of contract claims.

In Minnesota, a claim for breach of contract requires a claimant to show: (1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages.  Parkhill v. Minn. Mut. Life Ins. Co., 174 F. Supp. 2d 951, 961 (D. Minn. 2000); Briggs Transp. Co. v. Ranzenberger, 217 N.W.2d 198, 200 (Minn. 1974).

1.      **Acquisition Agreement ("AA") (Count V)**

Sierra alleges BOSI breached the AA by providing misleading information and omitting material facts regarding:  (1) BOSI's practice of delivering unbranded fuel to branded locations, (2) BOSI's use of its bulk storage facility to store Marathon branded fuel, (3) the contingent liabilities owed by the Pat's Shell C-store location, and (4) the estimated imaging costs for the Delano C-store location.  Pl.'s Mem. in Supp. of Partial Summ. J. [Docket No. 148] at 17-22.

a.      **Misbranded Deliveries Prior to the AA**

Sierra argues BOSI's failure to disclose the misbranded fuel deliveries made prior to the acquisition breached representations in the AA: (1) that BOSI was in substantial compliance with applicable laws and requirements; (2) that it reasonably anticipated sufficient revenues would be available to offset customer loans being assumed by Sierra; and (3) that the information provided in the AA was true and not misleading.

i.      **Substantial Legal Compliance**

Sierra contends BOSI breached Paragraphs 6.3 and 6.5 of the AA by representing that it was in compliance with applicable laws and requirements.  Those provisions read:

> 6.3     Information True and Not Misleading.   All material information provided to [Sierra] by [BOSI] in compliance with the provisions of this Agreement is now and will be as of the Closing Date true, accurate and complete in all material respects, does not contain any untrue statement of a material fact, and does not omit any fact necessary to make the material statements therein not misleading.
> . . .
>
> 6.5     Compliance with Regulations. [BOSI] covenants, represents, and warrants that [BOSI] has at all times and will, through the Closing Date, operate the Wholesale Gasoline Supply Business in substantial compliance with all materially applicable local, state and federal laws, regulations and requirements and that [BOSI], to the best of [BOSI's] knowledge after due and diligent inquiry (defined

8

> as [BOSI's] majority shareholder(s), key management personnel and officers), is not in violation of any such law, regulation or requirement.

Acquisition Agreement ¶¶ 6.3, 6.5.

Sierra argues that misbranded fuel deliveries are illegal and violate the exclusive supply agreements held with major oil companies.  Further, Sierra contends BOSI's failure to disclose such deliveries caused the representation in Paragraph 6.5 to be untrue and misleading, in breach of Paragraph 6.3.

BOSI admits that it did not expressly inform Sierra that deliveries of unbranded fuel to branded locations had occurred prior to the AA.  Leon Beaudry Dep. at 99-100; Kenneth Beaudry Dep. at 95-96.  However, BOSI argues failure to disclose such deliveries did not violate Paragraphs 6.3 and 6.5 because deliveries of unbranded fuel to branded locations were the result of branded fuel outages or extreme pricing and were customary in the fuel industry.  BOSI contends such deliveries are necessary to ensure branded locations have fuel to sell during fuel shortages or outages.  BOSI urges that Sierra is knowledgeable in the fuel industry, and would have known at the time the AA was executed that such deliveries had occurred.  Thus, BOSI contends that, based on industry custom, the representation in the AA that BOSI was in substantial compliance with applicable laws and regulations was not untrue or misleading.

To support its argument, Sierra relies on the expert report of Craig H. Walker who serves as senior counsel to Shell Oil Company and is responsible for the enforcement of Shell's rights under the Wholesale Marketer Agreements between Shell and its branded wholesalers.  Am. Expert Witness Disclosure [Docket No. 138] Ex. 3 ( "Walker Aff.") ¶ 2.  According to Walker, "[a]t no time has Shell condoned or excused a wholesaler's sale to the motoring public of

commingled, adulterated or misbranded gasoline under Shell's identifications." Id. ¶ 9. Walker

states that if Shell detects commingling or misbranding by its wholesalers, Shell's remedies

range from payment of a fine to termination of the relationship with the wholesaler. Id. ¶ 4.

Sierra also relies on deposition testimony of BOSI's employees who acknowledge that branded

locations are to receive their respective brand of fuel when the brand is available. 1st Hadac Aff.

Ex. 7 ("Deanna Scherber Dep.") at 16; Id. Ex. 5 ("Ronald Beaudry Dep.") at 22; Leon Beaudry

Dep. at 35-37.

 In support of its argument that misbranded fuel deliveries are known and customary in the

industry, BOSI relies on the expert report of Randy V. Thompson, an attorney who has represented

clients in the petroleum industry for the past thirty years. Defs.' Expert Witness Disclosures [Docket

No. 136] at 5. Thompson states:

> The oil companies recognize that misbranding occurs [due to fuel
> shortages or price disparities] . . . but seek to maintain plausible
> deniability that they know of trademark violations, because the oil
> company may also benefit. If product is unavailable, neither the oil
> company, the jobber nor the dealer wants to shut the station down for
> lack of gasoline for sale.

Id. ¶ 14. BOSI also cites Athans' deposition testimony stating his knowledge that misbranding

occurs in the fuel industry for a variety of reasons, including mistakes by fuel haulers and

extreme supply outages. Athans Dep. at 156-160. Athans also testified that he believes the

industry standard regarding unbranded fuel deliveries differs between major oil companies, who

would find one delivery of unbranded fuel to a branded location to be a material breach, and

"jobbers" (fuel haulers), who would not. Id. at 188.

 The conflicting evidence presents a fact question regarding whether BOSI breached

Paragraphs 6.3 and 6.5 of the AA by representing that it was in substantial compliance with

applicable laws and regulations.  Therefore, summary judgment is denied to both parties on this

portion of Sierra's breach of contract claim.

### ii.     Sufficient Revenues

Sierra next argues that BOSI breached the AA by representing that sufficient revenues

would be available to compensate Sierra for customer loans it assumed under the AA.  Paragraph

2.5 provides:

> <u>Reimbursement of Loans</u>.  In addition to payment of the Purchase
> Price, [Sierra] shall at closing reimburse [BOSI] for up-front imaging
> or other loans and earned interest ("Loans") [BOSI] has made to
> some of the customers listed on Exhibit A . . . .  *[BOSI] will at*
> *closing assign to [Sierra] the balance of principal and interest owed*
> *to [BOSI] for the Loans. [BOSI] represents that it reasonably*
> *anticipates that sufficient revenues are and will be available (in the*
> *form of rebates and/or dealer obligations) to offset the liabilities*
> *which are being paid hereunder.*

Acquisition Agreement ¶ 2.5 (emphasis in original).

Sierra contends BOSI's representation that sufficient revenues would be available to

compensate Sierra for the customer loans was untrue, because when the statement was made,

BOSI's delivery of unbranded fuel to branded locations was allowing struggling branded stores

to remain in business.  The unbranded deliveries also overstated the volume of branded fuel

actually sold, thus misrepresenting the likelihood that rebates would be earned from the major oil

companies by selling the necessary volume of branded fuel.  Sierra argues it was damaged by the

misrepresentation in Paragraph 2.5 because after the acquisition the profit margins of the C-

stores were deflated, rebates were not earned, and customer locations failed.  These events left

insufficient revenues to offset Sierra's liabilities for customer loans.

BOSI argues that even if nondisclosure of the misbranded deliveries were deemed to be a

breach of the AA, Sierra's claim nevertheless fails because it cannot show its damages were

caused by the breach.  BOSI urges the underperformance of several C-stores was likely caused

by other factors, including the ailing economy, new or inexperienced C-store owners, the

departure of Sierra's salesperson in Minnesota, and ConocoPhillips' decision to withdraw from

the market.      Under Minnesota law, the "proof required to support contract damages is similar

to that of tort:  the damages must result from (or be caused by) the breach."  Nguyen v. Control

Data Corp., 401 N.W.2d 101, 105 (Minn. Ct. App. 1987).  "Generally, proximate cause is a

question of fact for the jury; however, where reasonable minds can arrive at only one conclusion,

proximate cause is a question of law."  Lubbers v. Anderson, 539 N.W.2d 398, 402 (Minn.

1995).

        Sufficient evidence exists to raise a genuine issue of fact as to whether Sierra's damages

were caused by BOSI's failure to disclose misbranded fuel deliveries.  The failure of some C-

store locations very soon after the acquisition and Sierra's receipt of insufficient fund notices for

some customers almost immediately after the sale, support Sierra's contention that the

undisclosed misbranded deliveries allowed struggling C-stores to remain in business until after

the acquisition.  Additionally, the expert report of certified public accountant Edward Morris, Jr.

rules out escalating gas prices and the economy as a potential causes for customer failure.

Morris Report at 11.  The report observes that the largest spike in Sierra's customer failures

occurred in 2007, during a time when the U.S. economy was still growing and before gas prices

dramatically increased.  Id.

        On the other hand, BOSI has produced the expert report of certified public accountant

Michael Johnson, who disagrees with the conclusions reached in the Morris Report.  Defs.'

Expert Witness Disclosures at 23.  Johnson's review of a 2009 industry study by the National

Association of Convenience Stores revealed a steady trend from 2000 to 2009 of smaller, family-

based retail operations being replaced with newer and much larger convenience outlets, placing

pressure on older, existing locations.  Id. at 24.  Johnson concluded this trend may have

negatively affected Sierra's customers who had not upgraded their locations.  Id. at 24-25.

Johnson's report further states that the failure of some Sierra customer locations in 2007 and

beyond "is more likely than not associated with some decelerating rates of consumption in 2007,

2008, and 2009."  Id. at 25.  Johnson also identifies the new supply relationship with Sierra as a

factor that may have impacted the failure of contracts with customer locations.  Id. at 26.

Thus, the evidence raises a genuine fact issue as to whether Sierra's damages were

caused by BOSI's alleged breach of the AA, and the parties' motions for summary judgment on

this issue are denied.

### iii.     Ratification/Waiver

BOSI further contends that even if its nondisclosure of misbranded deliveries prior to the

AA constituted a breach of the AA, Sierra condoned the pre-acquisition practice by allowing it to

continue after the acquisition, and by billing and receiving payment for deliveries of misbranded

fuel.  BOSI argues that as a result of this conduct, Sierra ratified the AA or waived its right to

now claim the misbranded deliveries were a breach of the AA.

A party who may avoid a contract ratifies it by accepting and retaining the benefits of

that contract.  Mayer v. Countrywide Home Loans, 08-CV-1071, 2010 WL 597049, *3 (D.

Minn. Feb. 18, 2010) (citing Proulx v. Hirsch Bros., Inc., 155 N.W.2d 907, 912 (Minn. 1968)).

A ratifying party  must have full knowledge of the facts and its legal rights, and must have

intended to relinquish those rights.  Carpenter v. Vreeman, 409 N.W.2d 258, 262 (Minn. Ct. App. 1987).  Waiver is similarly "the intentional relinquishment of a known right."  Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 367 (Minn. 2009) (quotations omitted).  "Knowledge and intent are essential elements of waiver."  Id.  The intent to waive may be inferred from party conduct.  Id.; Klosek v. Am. Express Co., Civ. No. 08-426, 2008 WL 4057534, *14 (D. Minn. Aug. 26, 2008).  Whether a party's conduct constitutes a waiver is a fact question and is "rarely to be inferred as a matter of law."  Valspar, 764 N.W.2d at 367 (quotations omitted); see also Klosek, 2008 WL 4057534, at *15 (stating "the existence of a waiver is ordinarily deemed a question of fact, and implying waiver as a matter of law is disfavored.").

Sierra acknowledges invoicing its customers and receiving payment for misbranded fuel deliveries occurring after the AA, but argues it did not do so knowingly.  Sierra is headquartered in Illinois, and the delivery invoices were generated by clerical staff in Minnesota who entered coded numbers from bills of lading into an electronically automated billing system.  1st Athans Aff. ¶ 5.  Athans states Sierra relied on BOSI to deliver the appropriate branded gasoline to Sierra's customers.  Id.

However, there is evidence that Sierra knew of and did not object to misbranded deliveries occurring after the acquisition.  BOSI's former fuel dispatcher, Deanna Scherber, testified that she was required to e-mail Sierra regarding unbranded deliveries due to fuel outages:

> Usually, George [Athans] would have to give the final okay.  So, even if I e-mailed somebody other than George, that person got George involved.  But if there was an outage, George would be okay and he would instruct us to go ahead and bring the unbranded product

to the store.

Scherber Dep. at 98-99.

Thus, there is a genuine issue of fact as to whether Sierra knowingly and intentionally waived a breach of the AA.  Summary judgment is denied to both parties on this issue.

**b.     Marathon Agreement**

Sierra alleges BOSI's failure to disclose its storage of Marathon branded fuel in its bulk tank violated Paragraph 2.4 of the AA, in which BOSI represented that it reasonably anticipated sufficient revenues would be available to offset the liabilities Sierra assumed to oil companies. That provision reads:

> 2.4    Assumption of Contingent Debt.  In addition to payment of the Purchase Price, [Sierra] shall assume and agree to pay [BOSI's] contingent liability ("Contingent Liability") to the following three major oil companies: ConocoPhillips Petroleum Company, Shell Oil Company and Marathon Oil Company ("Three Oil Companies"), pursuant to the terms of [BOSI's] contracts with each of the Three Oil Companies and as described in the Exclusive Supply Agreements to be assigned to buyer at closing as set forth in Exhibit A.  The principal amount owed on said Contingent Liability is approximately $1,325,720.00.  *[BOSI] will at closing assign to [Sierra] the rebates that can be earned after the date of closing pursuant to agreements with the Three Oil Companies.  Seller represents that it reasonably anticipates that sufficient revenues are and will be available to offset the liabilities which are being assumed hereunder.*

Acquisition Agreement ¶ 2.4 (emphasis in original).

The Marathon Agreement, assumed by Sierra under Paragraph 2.4 of the AA, required Sierra to purchase a minimum volume of gasoline from Marathon and to supply gasoline to five specific Marathon stations. 1st Hadac Aff. Ex. 14.  Sierra was unable to meet the volume requirements under the Marathon Agreement, and ultimately was required to pay Marathon $41,422.27 for the volume shortfall.  1st Athans Aff. ¶ 4, Ex. 3.  Sierra contends that it would not

15

have purchased BOSI's business, or would have sought a substantial price reduction, had it known BOSI was not legitimately meeting its minimum volume requirement.  Id. ¶ 4.

BOSI disputes the claim, arguing Sierra has failed to produce evidence that BOSI placed Marathon fuel in its storage tank.  However, Leon Beaudry, BOSI's operations manager, has testified that he informed Athans at the sale closing that BOSI was authorized by Marathon to place Marathon fuel in BOSI's bulk tank, asked Athans if Sierra had a bulk tank, and told him that Sierra "might have a hard time" meeting Marathon's gallon requirement.  Leon Beaudry Dep. at 68-69.[5]  Ronald Beaudry, BOSI's operation manager also testified that on days when Marathon branded fuel was the lowest priced fuel available, BOSI would purchase the Marathon brand and store it in its bulk plant for delivery to farmers and commercial accounts.  Ronald Beaudry Dep. at 31-32.[6]  Thus, a reasonable jury could find BOSI's nondisclosure of its practice of storing Marathon branded fuel in its bulk plant breached Paragraph 2.4 of the AA by representing sufficient revenues would be available to offset Sierra's assumed liabilities to oil companies.

BOSI argues Sierra cannot prove its damages were caused by BOSI's alleged nondisclosure, and that Sierra's inability to meet the volume requirement under the Marathon Agreement was instead caused by the closing of four of the five Marathon branded locations after the acquisition.  However, Leon and Ronald Beaudry's testimony that BOSI used its bulk

---

[5] Later in his deposition, Leon Beaudry testified that BOSI's use of the bulk tank was only used to satisfy its volume requirements for a short while, and that "after that, we grew by many more stores, and there was no problem."  Leon Beaudry Dep. at 71.

[6] Ronald Beaudry also testified that BOSI easily met its volume requirement under the Marathon Agreement by selling to the Marathon stores that were serviced by BOSI.  Ronald Beaudry Dep. at 33-34.

plant to store Marathon fuel raises a genuine fact issue for the jury concerning the cause of

Sierra's failure to meet the Marathon volume requirement resulting in the financial damages to

Sierra.

### c.   Contingent Liabilities of Pat's Shell

Sierra argues BOSI breached Paragraphs 2.4 and 6.3 of the AA by not including Pat's

Shell on the list of locations that owed contingent liabilities to one of the three major oil

companies.  However, the AA states Sierra will assume the "liability described in the Exclusive

Supply Agreements to be assigned to [BOSI] at closing as set forth in Exhibit A."  Acquisition

Agreement ¶ 2.4.  The Exclusive Supply Agreements listed in the referenced Exhibit includes

Pat's Shell, as does a document titled "Ex. 1 Dealer Rebates" that is attached to the Bill of Sale

and Assignment.  See 2d Am. Compl. Ex. B at 4, 6.

Thus, Paragraph 6.3 was not breached with regard to the disclosure of the contingent

liability owed by Pat's Shell,[7] and summary is granted to BOSI and denied to Sierra on this

portion of Sierra's claim of breach of the AA.

### d.   Delano C-store Imaging Expenses

Sierra contends BOSI breached Paragraph 6.3 of the AA by representing in a Post

Closing Agreement that the cost for completing imaging work at the Delano C-store was "in the

approximate amount of $5,000."  1st Hadac Aff. Ex. 19 ("Post Closing Agreement").  The actual

---

[7] In its argument, Sierra relies on an exhibit to the Assignment of Exclusive Supply Contracts.  See 2d Am. Compl. Ex. C.  That exhibit, titled "Contingent Liabilities," lists contingent liabilities of $1,080,959 and does not list the contingent liability of Pat's Shell. However, had Pat's Shell's contingent liability of $103,590.85 been included in the amount in the Exhibit relied on by Sierra, the contingent liabilities on that Exhibit would have totaled $1,184,549.85, which is still less than the approximately $1,325,720 in contingent liabilities Sierra agreed to assume in Paragraph 2.4 of the AA.

costs totalled $42,113.13.  2d Am. Compl. ¶¶ 60-61; 3d Athans Aff. ¶ 3.

BOSI argues that at the time the representation was made, the imaging work had not been completed, and the actual costs were unknown.  BOSI also contends Sierra ratified the Post Closing Agreement by knowingly paying the bill without objection shortly after receiving it in early 2006.

Here, the undisputed evidence is that Sierra paid the invoices and retained the benefit of the completed work.  Sierra had knowledge of its right to object to the unanticipated costs at the time it paid for the work.  As a party to the AA, Sierra knew BOSI had represented in the AA that the costs would be approximately $5,000 rather than over eight times that amount.  Accordingly, Sierra ratified the Post Closing Agreement when it paid for the work years ago, and summary judgment is granted to BOSI as to this portion of Sierra's claim for breach of the AA.

## 2.     Fuel Hauling Agreement ("FHA") (Count VIII)

Sierra alleges BOSI's delivery of unbranded fuel to Beaudry Express and the Lunds breached the FHA.  The FHA provides in pertinent part:

> [BOSI's] rights pursuant to [the FHA] shall be relinquished and forfeited in the event that [BOSI] has failed to provide services in a timely, efficient, professional and/or commercially reasonable manner, which is customary for the fuel hauling industry. [Sierra's] reasonable and customary requests regarding operations and procedures shall not be unreasonably be denied.  FHA ¶ 1(b).
>
> . . .
>
> [BOSI] agrees: (i) to protect the petroleum products from contamination and to do nothing during the transportation or storage of the petroleum products which may result in contamination; (ii) to comply with all laws, ordinances and regulations regarding the transportation and storage of petroleum products; . . . (v) to . . . notify [Sierra] immediately if any contamination, adulteration or misbranding is discovered . . . .  FHA ¶ 2(a).

It is undisputed that during the period BOSI hauled fuel for Sierra under the FHA, Kenneth Beaudry directed the delivery of unbranded fuel rather than Shell fuel to Beaudry Express despite Athans' specific instructions to him in July 2008 not to do so. Kenneth Beaudry testified in his deposition that, after his conversation with Athans, "I did it one more time. . . . I was upset at Shell's pricing for that season." Kenneth Beaudry Dep. at 105-106. Kenneth Beaudry acknowledges that the unauthorized deliveries of non-Shell fuel to Beaudry Express following the conversation with Athans were not customary deliveries. Id. at 182. E-mail correspondence between BOSI's fuel dispatcher Deanna Scherber and Sierra employee Sara Hillegonds in September and October of 2008 further documents that deliveries made by BOSI were in violation of Sierra's explicit orders: "No, [S]hell had product. We were told to pull Valero by Ken Beaudry." 4th Athans Aff. Ex. 31 (Sept. 18, 2008 Scherber e-mail). "No, [S]hell was not out. We were instructed by Ken Beaudry to pulled [sic] Marathon Unbranded." Id. Ex. 30 (Oct. 3, 2008 Scherber e-mail). Kenneth Beaudry's actions breached the FHA by unreasonably denying Sierra's "reasonable and customary requests regarding operations and procedures," FHA ¶ 1(b), and by failing to immediately notify Sierra of the misbranding. Id. ¶ 2(a).

BOSI urges that the breach of the FHA was not material because the nonconforming deliveries to Beaudry Express were very small in proportion to the overall number of deliveries under the FHA. This argument lacks merit. While the materiality of a breach is ordinarily a fact question, Sitek v. Striker, 764 N.W.2d 585, 593 (Minn. Ct. App. 2009), no reasonable juror could find that BOSI's deliveries of non-Shell fuel to Beaudry Express in direct contravention of Sierra's explicit orders were not material breaches of the FHA. See Gibson v. City of Cranston,

37 F.3d 731, 736 (1st Cir. 1994) ("As is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law.").  Accordingly, summary judgment is granted in Sierra's favor on the issue of liability for breach of the FHA.  The issue of damages is reserved for trial.

### 3.     Exclusive Supply Agreement (Count VI)

Sierra alleges Beaudry Express and the Lunds breached the Exclusive Supply Agreement by accepting deliveries of non-Shell fuel.  The Exclusive Supply Agreement requires: (A) that all storage tanks and receptacles owned by Beaudry Express which are identified as Shell products be used exclusively for the storage and handling of Shell products, (B) that Beaudry Express not sell under the Shell trademark any petroleum products other than those provided by Sierra pursuant to the Exclusive Supply Agreement, and (C) that Beaudry Express and the Lunds will not mix petroleum products supplied by Sierra with any other product or material.  1st Hadac Aff. Ex. 16 ¶ 4(A)-(C).  The Lunds provided their personal guaranty of payment and performance of all obligations under the Exclusive Supply Agreement.  Id. ¶ 8.

It is undisputed that non-Shell fuel was delivered to Beaudry Express' storage tanks at the direction of Kenneth Beaudry in 2008.  Beaudry Express and the Lunds assert that Sierra condoned and ratified the deliveries by invoicing and receiving payment from Beaudry Express. However, these non-Shell fuel deliveries were made after Athans had expressly informed Kenneth Beaudry that such deliveries were prohibited, and were thus not condoned by Sierra. Sierra's seeking to enjoin future non-Shell deliveries further establishes that Sierra did not intend

to relinquish its rights as to such deliveries.  Accordingly, summary judgment is granted to Sierra

on Count VI.  The issue of damages is reserved for trial.

**4.      Non-Compete Agreement (Counts IX and XII)**

      **a.      CD Petro (Count XII)**

Sierra argues BOSI's delivery of gasoline to CD Petro LLC ("CD Petro") breached the

Non-Compete Agreement between the parties.[8]  The Non-Compete Agreement provides that

during the five year period following Sierra's purchase of the wholesale gasoline supply

business, BOSI and its owners, officers, directors, and shareholders shall not:

> directly or indirectly . . . participate in the ownership, management,
> operation or control of, or be employed by, any business that directly
> or indirectly competes with Sierra in the operation of a business of
> wholesale supply of gasoline and diesel fuel to retail gasoline
> station/convenience stores similar to the Wholesale Gasoline Supply
> Business operated by [BOSI].

1st Hadac Aff. Ex. 15 (Non-Compete Agreement) ¶ 1.

Chip Rice, an owner of CD Petro, avers that from July 2005 through September 2008,

CD Petro directly competed with Sierra.  During this time period, BOSI sold fuel to CD Petro

and delivered the fuel on CD Petro's behalf to retail gasoline station/convenience stores located

in Minnesota.  Rice Aff. [Docket No. 151] ¶¶ 1-5.  By delivering fuel for CD Petro, BOSI

participated in the operation of a business that "directly . . . competes with Sierra in the operation

of a business of wholesale supply of gasoline and diesel fuel to retail gasoline

station/convenience stores similar to the Wholesale Gasoline Supply Business operated by

---

[8] The Second Amended Complaint also alleges BOSI made deliveries to Pat's Shell in violation of the Non-Compete Agreement.  2d Am. Compl. ¶ 101.  However, neither party briefed this issue in their motions for summary judgment.  Therefore, to the extent the parties moved for summary judgment on this portion of Count XII, summary judgment is denied.

[BOSI]." Non-Compete Agreement ¶ 1. Accordingly, Sierra argues BOSI breached the Non-Compete Agreement.

BOSI acknowledges it sold and delivered fuel for CD Petro, but argues the Non-Compete Agreement allows an exception for commercial accounts such as CD Petro which are not retail gasoline/convenience stores. The Non-Compete Agreement does not prohibit BOSI "from continuing to operate . . . its business of supplying gasoline and diesel fuel to commercial accounts other than retail gasoline station /convenience stores ("Commercial Bulk Supply Business")." Id. The Court finds BOSI's argument unavailing. In hauling fuel to retail gasoline station/convenience stores on behalf of CD Petro, BOSI was not supplying gasoline to *CD Petro*. Rather, BOSI was supplying gasoline to *retail gasoline/convenience stores*. Therefore, BOSI's participation in CD Petro falls outside of the exception for commercial accounts. Summary judgment is granted to Sierra as to liability on Count XII with respect to CD Petro. The issue of damages is reserved for trial.

### b. Beaudry Express and the Lunds (Count IX)

Sierra also appears to seek summary judgment on Count IX[9] of the Complaint alleging BOSI breached the Non-Compete Agreement by delivering unbranded fuel to Beaudry Express without the authorization or consent of Sierra. Because neither party has briefed this issue, the Court denies both motions for summary judgment on Count IX.

---

[9] Sierra identifies "Counts XI and XII--Breach of Sellers Covenant Not To Compete" as among the counts for which it seeks summary judgment. Pl.'s Mem. in Supp. of Partial Summ. J. at 2. However, Count XI of the Second Amended Complaint is for Unjust Enrichment. The Court assumes a typographical error occurred, and that Sierra instead seeks summary judgment as to Count IX alleging "Breach of Contract (Sellers Covenant Not To Compete)." Id. at 18.

**C.      Tortious Interference with Contractual Relations (Count VII)**

Sierra alleges BOSI and Kenneth Beaudry tortiously interfered with Sierra's contractual relations by delivering misbranded fuel to Beaudry Convenience despite the Exclusive Supply Agreement between Sierra and Beaudry Convenience that requires exclusively Shell brand fuel to be received and sold at that location.

To prevail on a claim for tortious interference with a contract, Sierra must show: (1) the existence of a contract; (2) BOSI's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.  Kallok v. Medtronic, Inc., 573 N.W.2d 356, 362 (Minn. 1998).

That BOSI, having assigned the Exclusive Supply Agreement to Sierra, was aware of the contract is uncontested.  Additionally, there is no dispute that Kenneth Beaudry, after being instructed to deliver only Shell-branded fuel to that location, intentionally directed that non-Shell branded fuel be delivered to Beaudry Express.  BOSI has not provided evidence or an argument that the unauthorized delivery was justified.  See Kallock, 573 N.W.2d at 362 ("The burden of proving justification is on the defendant.").  Finally, Sierra was damaged because, but for BOSI's actions, it would not have had to seek an injunction against Beaudry Express and the Lunds to enforce its rights under the Exclusive Supply Agreement.  See id. at 363 (stating "the third-party litigation exception to the American rule permits a court to award attorney fees as damages if the defendant's tortious act thrusts or projects the plaintiff into litigation with a third party.").

BOSI's argument that Sierra ratified the misbranded fuel deliveries to Beaudry Express is negated by the misbranded deliveries having been made by BOSI and Kenneth Beaudry after

Sierra had expressly informed Kenneth Beaudry the such deliveries were prohibited.[10]

Accordingly, summary judgment is granted to Sierra on the issue of BOSI's liability for tortious

interference under Count VII.  The issue of damages is reserved for trial.[11]

**D.      Fraud**

In arguments parallel to its breach of contract claims, Sierra alleges it was fraudulently

induced into signing the AA and assuming the Marathon Agreement.  To prevail on

its claims for fraud, Sierra must establish the following elements:

> (1) there was a false representation by a party of a past or existing
> material fact susceptible of knowledge; (2) made with knowledge of
> the falsity of the representation or made as of the party's own
> knowledge without knowing whether it was true or false; (3) with the
> intention to induce another to act in reliance thereon; (4) that the
> representation caused the other party to act in reliance thereon; and
> (5) that the party suffer[ed] pecuniary damage as a result of the
> reliance.

City of Geneseo v. Utils. Plus, 533 F.3d 608, 617 (8th Cir. 2008) (quoting Hoyt Props., Inc. v.

Prod. Res. Grp., 736 N.W.2d 313, 318 (Minn. 2007)) (quoting in turn Specialized Tours, Inc. v.

Hagen, 392 N.W.2d 520, 532 (Minn. 1986) (alteration in the original)).

**1.      AA (Count XIV)**

Sierra argues it was fraudulently induced into entering the AA by the representations in

the AA that BOSI was in substantial compliance with applicable laws and that sufficient

---

[10] The argument would also fail as to deliveries made prior to Sierra's explicit instructions if a jury were to find Sierra did not knowingly and intentionally ratify such deliveries.

[11] Damages paid by Beaudry Express and the Lunds for breach of the Exclusive Supply Agreement will offset any damages Sierra may recover from BOSI under the tortious interference claim.  See Restatement (Second) of Torts§ 774(a)(2) (1979) (stating damages paid by a third party who was induced to breach a contract will reduce the damages recoverable for tortious interference with that contract).

revenues would be available to offset Sierra's assumed contingent liabilities to oil companies and for customer loans.  Sierra contends the representations were false and misled Sierra into believing it was purchasing a lawfully operating business, where in reality it received a tainted business propped up by falsely inflated profits.  2d Athans Aff. ¶ 5.  Sierra argues that if it had known that the representations in the AA were not true, it would not have paid more than $1,000,000 for the supply rights under the AA.  Id. ¶ 6.

### a.      False Statements of Fact

BOSI argues the representations in the AA were true and accurate based on Kenneth Beaudry's knowledge of industry practice and his personal review and knowledge of the performance histories of the customer locations.  Kenneth Beaudry Aff. [Docket No. 156] ¶ 18.  For the reasons identified in the breach of contract analysis above, the Court finds that the evidence raises a fact question regarding whether the representations in the AA were false.

### b.      Knowledge

Sierra urges BOSI and Kenneth Beaudry knew the representations in the AA were false at the time they were made.  BOSI and Kenneth Beaudry deny the allegation.  The evidence presents a genuine fact issue on the element of knowledge.

### c.      Intent

BOSI denies the representations in the AA were made with fraudulent intent.  Sierra, however, argues BOSI and Kenneth Beaudry knew the representations were false and intended Sierra to rely on them in entering into the AA.  The Court finds the evidence raises material issues of fact.

###### d.   Reasonable Reliance

BOSI argues Sierra cannot satisfy the reasonable reliance element of fraud because Sierra is a sophisticated party and failed to conduct adequate due diligence as contemplated in the AA. BOSI contends the misbranded deliveries were openly documented in BOSI's bills of lading, and Sierra was allowed complete access to BOSI's business records during the due diligence period.

"Reliance in fraud cases is generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue." Valspar, 764 N.W.2d at 369. "Whether a party's reliance is reasonable is ordinarily a fact question for the jury unless the record reflects a complete failure of proof." City of Geneseo, 533 F.3d at 617 (quoting Hoyt Props., 736 N.W.2d at 321).

Sierra is a sophisticated buyer in the fuel industry. Its president, Athans, has worked in the fuel industry since 1974 and has acquired retail and wholesale gasoline businesses in the past. Athans Dep. at 77-79. Sierra counters that it relied on the affirmative misrepresentations made in the AA regarding BOSI's substantial legal compliance, the sufficiency of anticipated revenues, and the truth of the information in the AA. Athans Dep. at 76; 1st Athans Aff. ¶ 4. A party may reasonably rely on a representation and is not obligated to conduct an investigation unless the falsity of the representation is known or obvious to the listener. Hoyt Props., 736 N.W.2d at 321.

BOSI relies on cases holding that a party who fails to request readily available information or who conducts an independent factual investigation cannot establish reasonable reliance. See Boubelik v. Liberty State Bank, 553 N.W.2d 393 (Minn. 1996); Valspar, 764 N.W.2d 359. However, the fraud alleged in Boubelik was based on a defendant bank's failure to

disclose information, and did not involve any specific, affirmative representations made by the

bank.  Id. at 398.  In holding that the bank was not liable for fraud because the plaintiffs had

failed to request readily available information, the court noted "that if the plaintiffs had been able

to make out a specific case of fraud against the bank, the bank would have been liable for harm

to the plaintiffs."  Id. at 401.  In contrast to the fact pattern in Boubelik, Sierra is alleging it was

defrauded by specific misrepresentations made in the AA.

 Valspar involved a supply agreement for automotive paint products that had been tested

by the plaintiff and found to be deficient prior to the execution of the agreement.  764 N.W.2d at

363.  Despite this knowledge, the plaintiff entered into the supply contract based on the

defendant's assurances that the problems would be resolved.  Id.  The court held the plaintiff

could not prevail on its claim for fraud because it had not demonstrated reasonable reliance on

the defendant's assurances that the product deficiencies would be corrected.  Id. at 369.  The

court reasoned that "[w]hen a party conducts an independent factual investigation before it enters

into a commercial transaction, that party cannot later claim that it reasonably relied on the

alleged misrepresentation."  Id.  Unlike the plaintiff in Valspar, however, Sierra did not have

knowledge of the circumstances upon which it now bases its claim for fraud.  "[Where] a party

to whom a representation has been made has not made an investigation adequate to disclose the

falsity of the representation, the party whose misstatements have induced the act cannot escape

liability by claiming that the other party ought not to have trusted him."  Commercial Prop. Invs.,

Inc. v. Quality Inns Int'l, Inc., 938 F.2d 870, 876 (8th Cir. 1991) (citation omitted) (alteration in

the original).

 BOSI's argument that the due diligence provision in the AA prevents Sierra from

claiming it reasonably relied on BOSI's representations is unpersuasive.  See Acquisition

Agreement  ¶ 7.2.  That provision states, in pertinent part, that Sierra would rely on its own

examination "*and other documents and information provided to [Sierra] by [BOSI]* in making

the decision to purchase the Assets as contemplated by this Agreement."  Id. (emphasis added).

Sierra states it relied on the information provided by BOSI in the AA.  Athans Dep. at 76.  Thus,

the due diligence provision did not cause Sierra to "contract away" its right to rely on BOSI's

representations in the AA.

Accordingly, a reasonable jury could conclude that Sierra's reliance on BOSI's

representations was reasonable.  Summary judgment is denied to both parties on this issue.

### e.      Damages, Proximate Cause

BOSI argues Sierra cannot prove damages caused by BOSI's alleged fraud.  Under

Minnesota law, the "out-of-pocket rule" is used to determine damages which are the natural and

proximate loss sustained by a party as a result of reliance on a misrepresentation.  B.F. Goodrich

Co. v. Mesabi Tire Co., Inc., 430 N.W.2d 180, 182 (Minn. 1988); Lewis v. Citizens Agency of

Madelia, Inc., 235 N.W.2d 831, 835 (Minn. 1975).  The loss is typically measured as the

difference between what plaintiff parted with and what was received, along with damages

naturally and proximately caused by the fraud prior to its discovery.  Id.  As with Sierra's

contract claim, whether Sierra's damages were naturally and proximately caused by the alleged

misrepresentations in the AA, as opposed to other factors such as the economy and changed

ownership and personnel, is a material fact question for the jury.  Accordingly, the Motions for

summary judgment are denied on Count XIV.

2.        **Marathon Agreement (Count XIII)**

Sierra argues it was fraudulently induced into assuming the Marathon Agreement by BOSI's representation in Paragraph 2.4 of the AA that sufficient revenues would be available to offset Sierra's assumed liabilities to oil companies.  Sierra alleges the representation was fraudulent because BOSI was meeting the Marathon Agreement's volume requirements only by filling its bulk fuel storage tank with Marathon branded fuel and using it for purposes other than to supply the five Marathon locations.  Sierra alleges the representation induced it to believe BOSI was in full compliance with the Marathon Agreement and that the value of the agreement was greater than it actually was.

As already discussed in the breach of contract analysis, a genuine issue of fact exists on whether BOSI was using its bulk plant to satisfy the Marathon Agreement's volume requirements at the time of the acquisition and, if so, whether this conduct caused the damages alleged by Sierra.  Just as with the AA, whether Sierra reasonably relied on and was damaged by BOSI's representations or omissions about the Marathon Agreement, as opposed to other causal factors such as the closing of some of the Marathon locations, are material fact questions for a jury.  Thus, the summary judgment motions are denied as to Count XIII.

**E.        Fraud/Piercing Corporate Veil (Count XV)**

Sierra argues Kenneth Beaudry, BOSI's sole shareholder, should be held personally liable for fraud.  Kenneth Beaudry allegedly used BOSI as a cover to engage in fraudulent and deceptive business practices to create the appearance to Sierra that his business was legally compliant and more valuable than it actually was.  Kenneth Beaudry responds that Sierra's fraud claims fail as a matter of law, and therefore Sierra's claim that Beaudry is individually liable as

BOSI's owner also fails.

Piercing the corporate veil is an equitable remedy that can be used to hold shareholders liable for fraud committed by a corporation.  G.G.C. Co. v. First Nat'l Bank of St. Paul, 287 N.W.2d 378, 384 (Minn. 1979).  In Minnesota, personal liability will be imposed where "the corporate form was used to accomplish a fraudulent purpose."  Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979).[12]

Because, as discussed above, Sierra's fraud claims present triable issues of fact, the parties' summary judgment motions on Count XV are denied.  If a jury were to find Kenneth Beaudry used BOSI to defraud Sierra, he, as sole shareholder of BOSI, will be held personally liable for his corporation's fraud.  G.G.C. Co., 287 N.W.2d at 384 (recognizing that piercing the corporate veil is available to hold shareholders liable where fraud has been shown).

**F.     Defendants' Requests for Relief as to Other Claims**

In addition to the specific counts analyzed above, the Defendants seek dismissal of all claims in the instant litigation.  However, Defendants advance no argument why they should be granted summary judgment as to Count I (Federal Trademark Infringement), Count II (Federal Unfair Competition), Count X (Conspiracy) and Count XI (Unjust Enrichment).  The Court's function is not to make a party's arguments for it.  Rayyan v. Sharpe, No. 1:08-cv-324, 2008 WL 4601427, at *7 (W.D. Mich. Oct. 15, 2008).  Therefore, Defendants' motion is denied as to these counts.

------

[12] Victoria Elevator also provides an analysis for determining whether, in the absence of fraud, piercing the corporate veil is justified to impose liability on an individual under the "alter ego" or "instrumentality" theory.  See Victoria Elevator, 283 N.W.2d at 512.  Because Sierra seeks to pierce the corporate veil on the basis of BOSI's alleged fraud, the Victoria Elevator factors are not analyzed here.

**G.    Sierra's Summary Judgment Motion Seeking Dismissal of Counterclaims**

Sierra seeks summary judgment dismissing Defendants' counterclaims for breach of the FHA, conspiracy to breach the FHA, and tortious interference with prospective contractual relations.

**1.    Breach of FHA**

BOSI alleges Sierra's use of Klemm Tank Lines, Inc. ("Klemm") to deliver fuel to Sierra's accounts breached the FHA requirement that Sierra use BOSI as its exclusive fuel provider in Minnesota.  In response, Sierra argues it was excused from performing under the FHA because BOSI breached the FHA first.

Under the "prior breach" doctrine, the non-performance of one party under a contract excuses the future contractual obligations of the other party.  Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh, 658 N.W.2d 522, 534 (Minn. 2003); Melford Olsen Honey, Inc. v. Adee, 452 F.3d 956, 965 (8th Cir. 2006); Parkhill, 174 F. Supp. 2d at 959.

As previously discussed, BOSI breached the FHA in July 2008 by delivering non-Shell branded fuel to Beaudry Express after Sierra had specifically informed BOSI that such deliveries were unacceptable.  Therefore, Sierra was excused from performing under the contract.

The FHA also states:

> (b)   [BOSI's] rights pursuant to this Agreement shall be relinquished and forfeited in the event that [BOSI] has failed to provide services in a timely, efficient, professional and/or commercially reasonable manner, which is customary for the fuel hauling industry.  [Sierra's] reasonable and customary requests regarding operations and procedures shall not unreasonably be denied.  FHA ¶ 1(b).

Kenneth Beaudry admits he denied Sierra's instructions not to deliver non-Shell branded fuel to Beaudry Express.  Kenneth Beaudry Dep. at 105-106.  Accordingly, BOSI's rights were

relinquished and forfeited under the FHA, and Sierra's motion for summary judgment on the counterclaim for breach of the FHA is granted.

### 2.    Conspiracy to Breach FHA

BOSI asserts a counterclaim against Sierra for conspiracy to breach the FHA, alleging that Sierra conspired with Klemm to breach the agreement.  Because Sierra did not breach the FHA, there is no underlying wrongful act upon which to base a claim for conspiracy, and Sierra's motion for summary judgment on the conspiracy counterclaim is granted.  See SICK, Inc. v. Motion Control Corp., Civ. No. 01-1496, 2003 WL 21448864, *11 (D. Minn. June 19, 2003) (dismissing civil conspiracy claim because underlying claim for breach of contract was dismissed).

### 3.    Tortious Interference with Prospective Contractual Relation

Beaudry Express and the Lunds allege Sierra tortiously interfered with their potential sale of Beaudry Express by failing to provide them with information they needed to market Beaudry Express to prospective buyers.  Defs.' Answer [Docket No. 86] at 4-5.

The Lunds allege that in 2008 they attempted to sell Beaudry Express by having Kenneth Beaudry contact companies including SuperAmerica, Holiday, Quick Trip, and Freedom Oil to determine their interest.  1st Hadac Aff. Ex. 2 ("Lisa Lund Dep.") at 50, 60-61; id. Ex. 1 ("Josh Lund Dep.") at 22-23.  The Lunds requested Sierra to provide them with the payoff amount required to release Beaudry Express from its contractual commitments so they could provide potential purchasers with a sale price, but allegedly the information was not provided until 2009. Lisa Lund Dep. at 50-51; Josh Lund Dep. at 20-23.  In June 2010, Croix Oil allegedly agreed to purchase Beaudry Express for $2.1 million.  Lisa Lund Dep. at 51, 54.  Ultimately, the sale fell

through.  Beaudry Express and the Lunds claim the sale to Croix Oil failed as a direct result of

Sierra's delay in providing the payoff figures.  Defs.' Mem. in Opp. to Pl.'s Mots. [Docket No.

162] at 21-22.

To prevail on their claim that Sierra tortiously interfered with their prospective business

relations, Beaudry Express and the Lunds must show:

> (1) that [they] had a reasonable expectation of economic advantage
> or benefit; (2) that [Sierra] knew of that expectation; (3) that [Sierra]
> wrongfully interfered with the expectation without justification; (4)
> causation; and (5) damages.

Day Distributing Co. v. Nantucket Allserve, Inc., No. 07-CV-1132, 2008 WL 2945442, *9 (D.

Minn. July 25, 2008) (citing Lamminen v. City of Cloquet, 987 F. Supp. 723, 731 (D. Minn.

1997), aff'd per curiam as modified, 162 F.3d 1164 (8th Cir. 1998)).

Beaudry Express and the Lunds have failed to establish essential elements of their claim

for tortious interference with a prospective business relations.  First, with the possible exception

of the alleged agreement with Croix Oil, the Lunds and Beaudry Express cannot establish they

had a reasonable expectation of economic advantage.  Under this element, a prospective business

relationship must be identified with specificity; the mere loss of unspecified business does not

suffice.  Day Distributing, 2008 WL 2945442, *9.  There is no evidence that any of the

companies Kenneth Beaudry spoke with in 2008 were interested in purchasing Beaudry Express

or would have offered to purchase Beaudry Express for an acceptable price.[13]  Therefore, the

contention that these companies would have purchased Beaudry Express if Sierra had provided

---

[13] Lisa Lund stated she believed Holiday may have made an offer, but was unsure
whether such offer was written and does not recall how much Holiday offered to pay for
Beaudry Express.  Lisa Lund Dep. at 53.  In any event, the offer was not accepted by the Lunds
because they decided to sell to Croix Oil.  Id.

the requested payoff information is pure speculation.  See Lamminen, 987 F. Supp. at 732

(denying claim for intentional interference with prospective business relations because plaintiff's

assertion that he would have been the lowest bidder but for the defendants' wrongful act was

"pure speculation" in the absence of evidence to support such an assertion).

Additionally, even if Beaudry Express had a reasonable expectation of economic

advantage or benefit with Croix Oil, they cannot establish the element of causation.  Sierra's

alleged delay in providing payoff amounts until 2009 cannot have caused the sale to Croix Oil to

fail in 2010.[14]

Finally, Beaudry Express and the Lunds have provided no evidence to establish any

damages.  See Lisa Lund Dep. at 62 ("Well, we haven't – we'll run some numbers . . .  I haven't

done any research yet); Josh Lund Dep. at 26 (stating he is "not sure" what damages have been

suffered as a result of Sierra allegedly not providing payoff amounts).

Because Beaudry Express and the Lunds cannot satisfy the required elements for a claim

of tortious interference with prospective business relations, Sierra's motion for summary

judgment on the counterclaim is granted.

---

[14] Though not argued in the brief opposing dismissal of the tortious interference counterclaim, Beaudry Express and the Lunds may argue that Sierra's conduct immediately prior to the anticipated closing date of the Croix Oil sale caused the sale not to be consummated.  The day after Croix Oil announced it would not go forward with the sale, counsel for Beaudry Express e-mailed Sierra's counsel to suggest the failure of the sale was due to Sierra's delay in responding to a document circulated by Croix Oil.  The e-mail stated:  "Croix Oil pulled out of the deal, as they had not heard from your client regarding a summary Agreement the Croix Oil attorney drafted and circulated."  Hadac Aff., Feb 1, 2011 [Docket No. 144] ("2d Hadac Aff.") Ex. 9.  Sierra's counsel responded that the summary Agreement had been received by Sierra only hours before Croix Oil had backed out.  Id.  Beaudry Express' counsel replied by acknowledging that the delayed response was not solely to blame for the failed sale:  "Bob, the new document came from Croix's attorney.  I think there were several issues Croix had and signing the new document was just one of them."  Id.  Therefore, there is no evidence to support an allegation that, but for Sierra's conduct, the sale to Croix Oil would have been completed.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Defendants' Motion for Summary Judgment [Docket No. 153] is GRANTED IN

PART and DENIED IN PART.  Summary judgment is granted in favor of Defendants on the

portions of Count V relating to the contingent liability of Pat's Shell and the imaging expenses of

the Delano C-store, and those portions of Count V are DISMISSED with prejudice.

2.  Plaintiff's Motion for Summary Judgment Dismissing Defendants' Counterclaims

[Docket No. 141] is GRANTED, and Defendants' Counterclaims are DISMISSED with

prejudice.

3.  Plaintiff's Motion for Partial Summary Judgment [Docket No. 146] is GRANTED IN

PART and DENIED IN PART.  Summary judgment is granted in favor of Plaintiff as to

Defendants' liability for Counts VI, VII, VIII and XII (as it relates to CD Petro), with the issue

of damages reserved for trial.

4.  Count III (State Deceptive Trade Practices) and Count IV (Unlawful Practices) are

voluntarily DISMISSED.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 24, 2011.